205 N.J. Super. 373 (1985)
500 A.2d 1089
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
BARBARA ELMORE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted March 20, 1985.
Decided November 14, 1985.
*375 Before Judges FRITZ, GAULKIN and LONG.
Joseph H. Rodriquez, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, of counsel and on the brief).
Irwin I. Kimmelman, Attorney General of New Jersey, attorney for respondent (Lisa B. DuBois, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by LONG, J.A.D.
After a trial by jury, Barbara Elmore was convicted of reckless manslaughter (N.J.S.A. 2C:11-4(a)) in connection with the death of her three month old daughter, Jennifer. She was sentenced to an indeterminate custodial term not to exceed four years. On this appeal she claims that her inculpatory statement to the authorities should have been suppressed because the circumstances surrounding its taking violated her right against self-incrimination and her right to counsel; that evidence of prior instances of child abuse on her part should have been excluded, and that at trial the State withheld evidence material to her defense and thus deprived her of full and effective cross-examination. She argues that these errors warrant reversal.
Because we agree that Elmore's rights under the Fifth Amendment to the United States Constitution as articulated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. *376 1880, 68 L.Ed.2d 378 (1981) were violated by representatives of Gloucester County Prosecutor's office with the result that her incriminating statement was improperly admitted into evidence, we reverse and remand for a new trial.
The facts in the case are as follows: As a result of an autopsy performed on Jennifer Elmore after her pediatrician's suspicions were aroused as to the cause of the child's death, it was determined that she died from craniocerebral injuries inflicted either by a blow to her head or violent shaking. Thereafter Jennifer's parents (Elmore and her husband, George) were called to the offices of the Division of Youth and Family Services (DYFS). When they arrived they were told that Gloucester County Prosecutor's detectives were on the way to question them about Jennifer's death. Later, they were separately transported to the Gloucester County Prosecutor's office. On arrival, Mrs. Elmore was placed in an office with Detective Watson and Investigator Reese and permitted to make a phone call. She called her mother and during the conversation became extremely emotional and upset and claimed that she was not permitted to have an attorney. At that point, Watson interrupted Elmore and told her that no one had denied her that request since she never asked for an attorney. Elmore was then left in the company of Reese while a statement was taken from her husband.
Around this time an attorney, Fred Last, was contacted on Elmore's behalf by her sister, Lillian Severino. Severino and Elmore's sister-in-law, Sally Lowell, met Last at his office and accompanied him to the prosecutor's office. Before they arrived, Last called the prosecutor's office and asked Detective Layton if he could come and talk to Elmore. Layton agreed. When Last arrived at the prosecutor's office Detective Layton advised him that he would see if Elmore wanted to speak to him. Although there is a difference of opinion between the officers as to exactly what Layton told Investigator Reese about Last, it is undisputed that Reese simply asked Elmore whether she wanted to see an attorney who was in the office. Elmore replied that she would "like to finish up in here first *377 and then I will speak to the attorney." Reese relayed this information to Layton who, in turn, advised Last that Elmore did not wish to speak to him. Last became insistent and a heated exchange ensued at the end of which Layton ordered him out of the office. According to Elmore, she thought that the attorney who wished to speak to her was from the prosecutor's office and that her only choice was whether to speak to him before or after the statement was taken.
Thereafter Detective Watson arrived, set up a tape recorder and took a statement from Elmore. At the beginning of the tape Elmore was asked if she was familiar with her Miranda rights. When she answered no, Detective Watson asked her to read aloud a card which contained the so-called Miranda warnings. She did so as follows:
You have the right to remain silent and refuse to answer any questions, anything you say may be used against you in a court of law, you have the right to consult with an attorney at any time and have him present before and during questioning. If you cannot afford any attorney one will be provided if you so desire prior to any questioning. A decision to waive these rights is not final and you may have ... you may withdraw your waiver whenever you wish either before or during questioning.
When asked if she now understood her rights and what was meant by the term Miranda warnings, Elmore responded affirmatively. She then signed the card to acknowledge that she understood her rights. Elmore later testified that she did not understand the warning but was embarrassed to admit it.
Elmore then gave an extremely incriminating statement to the police including admissions that she had "disciplined" Jennifer since the child was born, that she hit her in the face and that while she often felt guilty about hitting Jennifer, that sometimes she "felt good that [she] did it." In the statement Elmore indicated that, in her view, even tiny babies need discipline. She said that she felt that Jennifer was "spiteful" and "[knew] how to get around [her] parents," and that Jennifer deliberately cried because "she knows crying bothered us." She stated that neither she nor her husband wanted Jennifer, that the addition of the child to the household "caused almost a separation or divorce" and that she was very disappointed that *378 Jennifer wasn't a boy. Elmore also said that she was having problems accepting Jennifer because Jennifer was only 11 months younger than her older child, Christina, and that she "just ... couldn't cope." These are only brief portions of Elmore's lengthy statement which contains obvious efforts on her part to exculpate herself from suspicion but which, when read as a whole, was a devastatingly effective part of the State's case against her. The trial judge denied Elmore's motion to suppress because he found that she understood her Miranda rights and had waived them voluntarily before giving the statement.
At trial, the State produced the testimony of Leigh McGregor, a family friend of the Elmores, who was the only witness to say that she observed Elmore abusing Jennifer. She related that she saw Elmore injure Jennifer on three occasions during the month before Jennifer's death, twice because the child would not cooperate with eating and once because she would not stop squirming while Elmore was trying to change her diaper. On the last occasion, McGregor said that Elmore hit Jennifer on the side of the head with an open palm causing the baby to let out a loud scream.
A number of other witnesses were produced by the State and the defense during the course of the trial including doctors, nurses, social workers, friends and relatives of Elmore. It is unnecessary to outline that testimony here since it does not impact on the narrow issue presented. Elmore took the stand and testified in her own behalf. She said that on the morning of June 22, 1980 she was awakened at 6:00 a.m. by Jennifer's routine fussing. She testified that since she maintained precise schedules and didn't believe in getting her children up before 8 a.m., she picked Jennifer up and put her in her playpen in the living room and then went back to bed. She said she lay in bed and dozed until about 7:30 a.m. when she again heard the baby fussing. She claimed that when she got up at 7:45 a.m. she found Jennifer blue and lying face down in the playpen. She said that she picked the baby up, started shaking her and smacking her in the face and then tried to give her mouth-to-mouth *379 resuscitation. Elmore testified that when that didn't work she started screaming that the baby was dead, which woke her husband, who came running out and took the baby from her. She said that she then ran outside, running around in circles screaming. Her husband called the ambulance and Jennifer was transported to the hospital by the ambulance squad which administered first aid. Jennifer died in Children's Hospital, Philadelphia, on the following day. The case ultimately went to the jury, which acquitted Elmore of aggravated manslaughter but convicted her of reckless manslaughter.
The initial question presented is whether Elmore's statement to her mother on the telephone constituted a request for counsel sufficient to invoke her Fifth Amendment rights as defined by Miranda and Edwards, supra. In Miranda the Supreme Court of the United States declared that:
If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.... until an attorney is present. [384 U.S. at 473-474, 86 S.Ct. at 1627-28.]
Likewise, in Edwards the court reiterated the Miranda rule and indicated that once a suspect invokes the right to counsel he may not be subjected to further interrogation until counsel is provided unless the suspect himself initiates the dialogue. 451 U.S. at 484-485, 101 S.Ct. at 1884-85. It is also well established that even an equivocal request for counsel is effective to trigger the protections of the Fifth Amendment with respect to an interrogation. In State v. Wright, 97 N.J. 113 (1984) for example, where a defendant said, "I won't sign any more deeds without a lawyer present" (97 N.J. at 117), his subsequent interrogation and confession were ruled inadmissible. The court, citing State v. McCloskey, 90 N.J. 18 (1982), held that:
... because the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in the light most favorable to defendant. Our position in that case [McCloskey] was reinforced by the weight of authority, which liberally construes ambiguous requests. [97 N.J. at 119.]
The Wright court went on to state:
Applying this standard, we find that defendant's statement was sufficient to invoke the right to counsel. At the very least, and as found by the trial court, the interrogating agent was under an obligation to clarify the meaning of defendant's remark before proceeding with further questioning. See State v. *380 Fussell, 174 N.J. Super. 14, 21 (App.Div. 1980); discussion, supra at 120 n. 4. [97 N.J. at 120.]
In State v. Fussell, supra, defendant was arrested for murder. While being given his Miranda rights the following exchange occurred:
Q. Is it your desire to give a statement without the assistance of a lawyer?
A. I would like to wait for legal counsel after taking [sic], I would like him to read the statement before I answer.
Q. Don't you want to give us this statement?
A. Sure, I'll give you a statement. [174 N.J. Super. at 19.]
In concluding that the interrogating officer had failed in his duty to clarify the defendant's ambiguous response, the Fussell court cited United States v. Riggs, 537 F.2d 1219 (4 Cir.1976) where the observation was made that:
[W]here a suspect makes a statement which arguably amounts to an assertion of his Miranda rights and the interrogating agent recognizes that the statement is susceptible of that construction, his questioning with regard to the crime he is investigating should immediately cease and he should then inquire of the suspect as to the correct interpretation of the statement. Only if the suspect makes clear that he is not invoking his Miranda rights should substantive questioning be resumed. [537 F.2d at 1222.]
See also State v. Dickens, 192 N.J. Super. 290 (App.Div. 1983), certif. den., 97 N.J. 697 (1984); Maglio v. Jago, 580 F.2d 202 (6 Cir 1978); United States v. Clark, 499 F.2d 802 (4 Cir.1974).
We are well satisfied that Elmore's statement to her mother that she was not allowed to have a lawyer constituted the kind of an equivocal request for counsel described in the cited cases as an invocation of her Miranda rights which should have forestalled further interrogation.
The officer in charge in this case knew or should have known from Elmore's conversation with her mother that she was concerned about obtaining a lawyer. His response  that a lawyer could not have been denied since none was requested  falls far short of what could be considered a clarification of ambiguities so as to justify the conclusion that Elmore waived her right to counsel. North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). In our opinion the police were required under Miranda and Edwards to cease interrogating Elmore after she told her mother that they would not let her have a lawyer. Thereafter unless she either obtained *381 counsel, knowingly and voluntarily waived counsel or initiated dialogue with the police herself, no further interrogation was justified. The statement she gave upon the improper continued interrogation was thus inadmissible.
We note a second defect in these proceedings: the interrogation and subsequent statement of Elmore after the denial of access to attorney Last. No New Jersey decision has directly confronted the facts presented in this case. Courts in other jurisdictions which have addressed the issue have formulated an approach exemplified in New York's so-called Donovan  Arthur  Hobson rule. In People v. Donovan, 13 N.Y.2d 148, 193 N.E.2d 628, 243 N.Y.S.2d 841 (1963) the police obtained a written confession from defendant after they had refused to permit an attorney retained by his family to speak with him. In invalidating that confession the court discussed the protection against self-incrimination and the right to counsel:
In the case before us, these rights and privileges converge, for one of the most important protections which counsel can confer while his client is being detained by the authorities is to preserve his client's privilege against self-incrimination and prevent the deprivation of that and other rights.... It would be highly incongruous if our system of justice permitted the district attorney, the lawyer representing the State to extract a confession from the accused while his own lawyer, seeking to speak with him, was kept from him by the police. [193 N.E.2d at 629, 243 N.Y.S.2d at 843.]
The court found that the continued interrogation of a defendant
... after the lawyer retained by him or his family have requested a conference violates not only the right to counsel but also ... "contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." [193 N.E.2d at 630, 243 N.Y.S.2d at 844, quoting People v. Waterman, 9 N.Y.2d 561, 565, 175 N.E.2d 445, 448, 216 N.Y.S.2d 70, 75 (1961).]
In People v. Arthur, 22 N.Y.2d 325, 239 N.E.2d 537, 292 N.Y.S.2d 663 (1968), the court stated the rule this way:
Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel. [239 N.E.2d at 539, 292 N.Y.S.2d at 666; emphasis added.]
See also People v. Hobson, 39 N.Y.2d 479, 348 N.E.2d 894, 384 N.Y.S.2d 419 (1976).
The same result was reached in United States v. Thomas, 474 F.2d 110 (10 Cir.1973), cert. den. 412 U.S. 932, 93 S.Ct. *382 2758, 37 L.Ed.2d 160 (1973) and United States v. Durham, 475 F.2d 208 (7 Cir.1973), based on ethical considerations. In Thomas the court stated as its conclusion that:
... once a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given an opportunity to be present. [474 F.2d at 112].
See Mathies v. United States, 374 F.2d 312 (D.C. Cir.1967) in which Judge (now Chief Justice) Burger suggested that Miranda may require the presence of counsel at all interviews once the police are aware that an accused is represented. The point of the cited cases is that they eliminate any possibility of a waiver, no matter how knowing and intelligent, by a defendant for whom the State knows counsel has been appointed or retained, in the absence of that counsel. See Burbine v. Moran, 753 F.2d 178 (1 Cir.1985), cert. granted, ___ U.S. ___, 105 S.Ct. 2319, 85 L.Ed.2d 838 (1985). For this reason the rule they have formulated can be characterized as a per se rule.
Courts in the majority of jurisdictions although not faced with the kinds of facts presented in Donovan  Arthur  Hobson appear to have rejected the per se approach. Their reasoning is expressed in Moore v. Wolff, 495 F.2d 35 (8 Cir.1974):
If an accused can voluntarily, knowingly, and intelligently waive his right to counsel before one has been appointed, there seems no compelling reason to hold that he may not voluntarily, knowingly, and intelligently waive his right to have counsel present at an interrogation after counsel has been appointed. Of course, the Government will have a heavy burden to show that the waiver was knowingly and intelligently made, Miranda v. Arizona, supra, 384 U.S. at 475, 86 S.Ct. 1602 [at 1628], but we perceive no compelling reason to adopt the per se rule advocated by petitioner. [495 F.2d at 37.]
See also Blanks v. State, 254 Ga. 420, 330 S.E.2d 575 (Sup.Ct. 1985); United States v. Cobbs, 481 F.2d 196 (3 Cir.1973), cert. den., 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); Wilson v. United States, 398 F.2d 331 (5 Cir.1968), cert. den., 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969); Coughlan v. United States, 391 F.2d 371 (9 Cir.1968), cert. den. sub nom. Coghlan v. United States, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968); cf. United States v. Barone, 467 F.2d 247 (2 Cir.1972). All of these cases are distinct from Donovan  Arthur  Hobson *383 and from the facts presented here in that they involve defendants who knew of the availability of counsel but chose not to take advantage of it before giving a statement. They stand for the proposition that the absence of previously retained or assigned counsel does not per se preclude the possibility of a waiver of counsel by a defendant. Faced with similar facts, the court in State v. Kennedy, 97 N.J. 278 (1984), observed that:
The bare fact that defendant had counsel representing him cannot be construed to preclude defendant from effectively waiving his right to remain silent and to have an attorney present. [97 N.J. at 288, citing State v. Graham, 59 N.J. 366, 376 (1971).]
See also State v. McKnight, 52 N.J. 35 (1968).
It is difficult to say whether the courts which have formulated the less stringent rule in response to rather unremarkable facts would adhere to it in the more extreme circumstances presented in Hobson and here. We need not resolve the variant approaches to this issue however because the result is the same by either standard. When Elmore made her statement she did not have access to the attorney who was there on her behalf, so that under Donovan  Arthur  Hobson waiver was precluded. Moreover Elmore was never told of the presence of "her" lawyer or that Last had been retained by her family. She was only asked if she wished to see "a" lawyer who happened to be in the building. Indeed, it is undisputed that Elmore thought that she was being asked to see the prosecutor when this issue was raised. Thus there is nothing in the confluence of events reflected in this record which would support a finding that Elmore knowingly and voluntarily waived her right to consult with Last, the lawyer retained for her by her family. As such, his denial of access to her while she implicated herself clearly invalidated the fruits of all interrogation which took place after the denial occurred.
We end with the observation that we disagree with the State's contention that even if Elmore's statement should have been excluded, its admission was no more than harmless error. We view Elmore's statement as singularly incriminating. While the record contains some evidence of Elmore's guilt *384 independent of her statement, we cannot say with any degree of certainty that this evidence would surely have led to a conviction or that the jury could not have had a reasonable doubt as to whether Elmore was the perpetrator of the crime against Jennifer in the absence of her statement. This is especially true in light of the fact that the statement may well have made Elmore feel compelled to take the stand to explain away some of the more critical aspects of the statement. See State v. Hutchins, 43 N.J. 85 (1964). Thus we are unable to conclude that the error of its admission was harmless beyond a reasonable doubt. State v. McCloskey, 90 N.J. 18, 30-32 (1982); State v. Macon, 57 N.J. 325, 335-336 (1971). Accordingly we reverse and remand for a new trial.
The new trial will obviate Elmore's claims under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and we therefore need not grapple with that issue.
On the question of Leigh McGregor's testimony as to prior instances of abuse by Elmore, Elmore argues and the State concedes that the trial judge invoked an improper basis for the admission of that testimony by characterizing it as evidence of habit or custom. We agree. We note however, that prior episodes of child abuse unconnected with the cause of an infant's death are admissible under Evid.R. 55 as proof of intent or absence of mistake or accident. State v. Wright, 66 N.J. 466 (1975), rev'g on dissent, 132 N.J. Super. 130, 147 (App.Div. 1974); State v. Wilson, 158 N.J. Super. 1 (App.Div. 1978), certif. den., 79 N.J. 473 (1978). The only prerequisite is that, if requested by the defense, the trial judge is required to determine under Evid.R. 8(1) whether the prior events did, in fact, occur. Wilson, supra, 158 N.J. Super. at 10. The burden at such a hearing is on the State to prove the prior happenings by clear and convincing evidence. Ibid.
Reversed and remanded for a new trial.