[No. H002097. Sixth Dist. Aug. 11, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALDO ANGELO SULTANA, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976(b), only Part I of this opinion is certified for publication.

514

**COUNSEL**

Michael W. Stamp, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Stan M. Helfman and Karl S. Mayer, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

CAPACCIOLI, J.—Geraldo Angelo Sultana appeals from a judgment of conviction for voluntary manslaughter (Pen. Code, § 192, subd. (a)) of Simon Phillips following a court trial. The victim, a drug dealer, ultimately died of blows to his head. We affirm.

I

*Motion to Suppress Incriminating Statements*

On September 27, 1985, Sultana unsuccessfully moved to suppress statements he made in jail during an April 17, 1985, interview with Officer Upton. At the time of the interview, a criminal complaint charging Sultana with murder (Pen. Code, § 187) had been filed and a preliminary examination hearing had been held, at which Sultana had been ordered to appear for further proceedings in superior court on April 23, 1985. In the most damaging of his statements, Sultana conceded that the victim's blood was on his clothing.

At the hearing held on the motion, the transcript of the interview, which had been taped, was received into evidence by stipulation of the parties. The transcript showed that Officer Upton commenced the April 17 exchange by confirming that Sultana had completed the inmate request form requesting to speak with him, still wished to speak with him, and was initiating their conversation. Upton informed Sultana of his *Miranda*[1] rights. Sultana indicated that he ". . . knew that was coming" and he understood ". . . them all perfectly." Upton told Sultana that he could stop the interview at any time. Sultana signed a form waiving his *Miranda* rights.

The transcript also shows that Sultana indicated to Upton that he no longer had a private attorney because he had run out of money and, until he found a public defender, he wanted to ask Upton questions regarding the police investigation. In particular, Sultana wanted to know what the police were doing to investigate an individual named Ronzano. Sultana insisted that he had nothing to confess and was innocent. He told Upton that he could not ". . . afford a private investigator, so [he was] going to use [his] tax dollars." Sultana also commented: "I've got no more attorney and no more money and then they get some law[yer] down the street here. Someone with 75 cases going and trying to take care of me now."

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

Officer Upton testified at the motion hearing. He stated that he had been employed by the Santa Cruz Police Department for 16 years. He also had been teaching classes regarding the administration of justice at Cabrillo College since approximately 1977. Upton stated that Sultana had been his student approximately two years prior to the hearing. Sultana had taken a basic and an advanced course in private security officer's training. The classes involved 96 hours of training and a lot of teacher-student interaction. The classes addressed, among other things, the constitutional principles applicable to actions of private security officers compared to actions of police officers. It was Upton's opinion that Sultana and he ". . . knew each other pretty well."

Upton recalled that at the time of the April 9, 1985, preliminary hearing he was aware that Sultana was represented by privately retained counsel. After the preliminary examination, Upton was notified by the Santa Cruz County jail that Sultana was attempting to contact him. Officer Upton telephoned the district attorney's office ". . . to check on the legality of contacting Mr. Sultana" and was told to go ahead with the interview. When Upton arrived at the jail, he received an inmate request form in which Sultana requested to speak with him. He advised Sultana of his *Miranda* rights and obtained a written waiver of those rights.

Sultana contends that his statements should have been excluded from evidence at trial because they were obtained in violation of his Fifth Amendment and Sixth Amendment rights and were involuntary. We disagree.

### A

*Fifth Amendment Privilege Against Self-incrimination*

█ Sultana argues that his purported waiver of *Miranda* rights on April 17, 1985, was rendered involuntary by the circumstances at the time of his waiver. Those circumstances included the fact that he was in jail facing a murder charge, his belief that his privately retained attorney was no longer working for him, and his belief that he needed Officer Upton to do investigatory work for him.

█ "Under [the U.S. Supreme] Court's decision in *Miranda* v. *Arizona* . . ., prior to a custodial interrogation a criminal suspect must 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' [Citation.]" (*Colorado* v. *Spring* (1987) 479 U.S. 564, 567, fn. 1 [93 L.Ed.2d 954, 961, 107 S.Ct. 851].) "The

Court's fundamental aim in designing the Miranda warnings was 'to assure that the individual's [Fifth Amendment] right to choose between silence and speech remains unfettered throughout the interrogation process.' [Citation.]"[2] (*Id.* at p. 572 [93 L.Ed.2d at p. 965].)

█ "Consistent with this purpose, a suspect may waive his Fifth Amendment privilege, 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.]" (*Id.* at p. 572 [93 L.Ed.2d at p. 965].) "The inquiry whether a waiver is coerced 'has two distinct dimensions.' [citation]: [¶] 'First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an un-coerced choice and the requisite level of comprehension may a court prop-erly conclude that the Miranda rights have been waived.' [Citation.]" (*Ibid.*)

█ "[A] valid waiver does not require that an individual be informed of all information 'useful' in making his decision . . . [Citation.]" (*Id.* at p. 576 [93 L.Ed.2d at p. 967].) The Supreme Court has "'. . . never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' [Citation.]" (*Ibid.,* fn. omitted.) "The sole concern of the Fifth Amendment, on which Miranda was based, is govern-mental coercion. [Citations.]" (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 170 [93 L.Ed.2d 473, 486, 107 S.Ct. 515].) The U.S. Supreme Court has rejected the notion that a purported waiver is ". . . invalid whenever the defendant feels compelled to waive his rights by reason of any compulsion, even if the compulsion does not flow from the police." (*Ibid.*)

█ In this case, Sultana was well aware of and understood his right to have counsel present during his discussions with Upton. Although he ap-parently believed that his privately retained counsel was no longer working for him, Sultana was informed by Upton that "[i]f you cannot afford to hire a lawyer, one will be appointed to represent you before questioning if you wish." Sultana's comments to Upton during the interview indicated that he understood that a public defender would represent him. The urgency

---

[2] "The Fifth Amendment of the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.' This privilege 'is fully ap-plicable during a period of custodial interrogation.' [Citation.]" (*Colorado* v. *Spring, supra,* 479 U.S. 564, 572 [93 L.Ed.2d 954, 964].) "This privilege is applicable to the States through the Due Process Clause of the Fourteenth Amendment of the Constitution. [Citation.]" (*Id.* at p. 572, fn. 5 [93 L.Ed.2d at p. 964].)

Sultana felt to speak to Officer Upton, with whom he had a personal relationship, was not the result of any coercion on the part of the police. Any Fifth Amendment claim was properly rejected.

B

*Sixth Amendment Right to Counsel*

■  Sultana argues that the state violated his Sixth Amendment right to counsel by failing to contact his privately retained attorney of record before the April 17, 1985, interview. We reject this argument.

■  It is clear that ". . . once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." (*Brewer* v. *Williams* (1977) 430 U.S. 387, 401 [51 L.Ed.2d 424, 438, 97 S.Ct. 1232], fn. omitted; see *Massiah* v. *United States* (1964) 377 U.S. 201, 205-206 [12 L.Ed.2d 246, 250, 84 S.Ct. 1199].) Thus, Sultana's Sixth Amendment right to attorney had attached at the time of the April 17 interview.

The United States Supreme Court stated in *Maine* v. *Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477] that the Sixth Amendment guarantee ". . . includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right." (*Id.* at p. 176 [88 L.Ed.2d at p. 496].) The Court further explained: "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." (*Ibid.*, fn. omitted.)

However, the pronouncements in *Maine* v. *Moulton* must be understood in the context of that case, which involved surreptitious recording of conversations between Moulton and his codefendant, an undercover informant. (474 U.S. at pp. 176-180 [88 L.Ed.2d at pp. 496-499].) It did not involve a defendant-initiated interrogation with known governmental authorities.

The Supreme Court has indicated that a defendant may waive his Sixth Amendment right to counsel by initiating an "interrogation" with known

governmental authorities. (*Michigan* v. *Jackson* (1986) 475 U.S. 625 [89 L.Ed.2d 631, 106 S.Ct. 1404].)[3]

In *Michigan* v. *Jackson, supra,* 475 U.S. 625, the United States Supreme Court faced the question whether postarraignment statements made after a waiver of *Miranda* rights nevertheless violated the Sixth Amendment where a defendant requested appointment of counsel at his arraignment and was not afforded counsel during a police-initiated interrogation. (*Id.* at p. 626 [89 L.Ed.2d at p. 636].) The Court noted that in *Edwards* v. *Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880] it had held in the Fifth Amendment context that ". . . an accused person in custody who has 'expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.' [Citation.]" (*Michigan* v. *Jackson, supra,* 475 U.S. at p. 626 [89 L.Ed.2d at p. 636].) The Court stated *Edwards* v. *Arizona* established a bright-line rule that " 'once a suspect has invoked the right to counsel, any subsequent conversation must be initiated by him.' [Citation.]" (*Ibid.*) The Court found that the reasoning of *Edwards* applied with even greater force to cases analyzed under the Sixth Amendment and held that ". . . if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." (*Id.* at p. 636 [89 L.Ed.2d at p. 642].)

In two cases since *Edwards* v. *Arizona,* the U.S. Supreme Court has found no Fifth Amendment violation where the defendant initiated an interrogation and waived his *Miranda* rights. In *Wyrick* v. *Fields* (1982) 459 U.S. 42 [74 L.Ed.2d 214, 103 S.Ct. 394], an accused requested a polygraph examination on the advice of his privately retained counsel. (*Id.* at pp. 43-46 [74 L.Ed.2d at pp. 216-218].) When he appeared for the examination, he was informed of, and waived, his *Miranda* rights and he told authorities that he did not want his counsel present during the examination. (*Id.* at pp. 43-46

---

[3] We are aware that there are a number of California cases which state that an accused cannot waive the Sixth Amendment right to assistance of counsel and cannot be interrogated without the express consent of his attorney once the right has attached. (See e.g. *People* v. *Sharp* (1983) 150 Cal.App.3d 13, 17 [197 Cal.Rptr. 436]; *In re Michael B.* (1981) 125 Cal.App.3d 790, 793-794 [178 Cal.Rptr. 291]; *People* v. *Boyd* (1978) 86 Cal.App.3d 54, 60 [150 Cal.Rptr. 34]; *People* v. *Isby* (1968) 267 Cal.App.2d 484, 489-495 [73 Cal.Rptr. 294].) Other California cases find that the Sixth Amendment right to counsel may be waived by a defendant who initiates an interrogation. (See e.g. *People* v. *Rankins* (1986) 178 Cal.App.3d 1163, 1165-1166 [224 Cal.Rptr. 282]; *People* v. *Dickson* (1985) 167 Cal.App.3d 1047, 1052-1057 [213 Cal.Rptr. 722]; *People* v. *Manson* (1976) 61 Cal.App.3d 102, 164 [132 Cal.Rptr. 265]; *People* v. *Rowe* (1972) 22 Cal.App.3d 1023, 1032 [99 Cal.Rptr. 816].) The California Supreme Court had not addressed that split of authority.

[74 L.Ed.2d at pp. 216-218].) He then made incriminating statements when questioned about his responses immediately following the examination. (*Id.* at pp. 44-45 [74 L.Ed.2d at p. 217].) The United States Supreme Court held, in a per curiam opinion, that there was no Fifth Amendment violation since by requesting a polygraph examination the accused initiated an interrogation and the questioning immediately following the examination was part of that interrogation. (*Id.* at p. 47 [74 L.Ed.2d 218-219].)

In *Oregon* v. *Bradshaw* (1983) 462 U.S. 1039 [77 L.Ed.2d 405, 103 S.Ct. 2830], an accused invoked his right to an attorney after being placed under arrest during questioning at the police station. (*Id.* at p. 1041 [77 L.Ed.2d 410].) While being transferred from the police station to the county jail, the accused asked an accompanying officer what was going to happen to him. (*Id.* at p. 1041 [77 L.Ed.2d 410].) The officer responded by reiterating that the accused did not have to talk with him unless the accused so desired. (*Ibid.*) The accused indicated that he understood and a dialogue ensued. (*Ibid.*) On the suggestion of the officer, the accused agreed to take a polygraph examination. (*Ibid.*) An examination was administered after the accused was informed, and signed a written waiver, of his *Miranda* rights. (*Ibid.*) When, at the conclusion of the questioning, the examiner told the accused that he thought the accused had been lying, the accused made incriminating statements. (*Ibid.*) The United States Supreme Court held there was no Fifth Amendment violation since the accused had initiated conversation with the police officer and ". . . evinced . . . a desire for a generalized discussion about the investigation . . ." by asking what was going to happen to him and since the accused had waived his *Miranda* rights. (*Id.* at pp. 1045-1046 [77 L.Ed.2d at p. 412].)

The Court in *Oregon* v. *Bradshaw* discussed what it meant by "initiate": "There can be no doubt that in this case that in asking, 'Well, what is going to happen to me now?', respondent 'initiated' further conversation in the ordinary dictionary sense of that word. While we doubt that it would be desirable to build a superstructure of legal refinements around the word 'initiate' in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." (462 U.S. at p. 1045 [77 L.Ed.2d at p. 412].)

In this case, Sultana independently requested in writing to speak with Officer Upton. Upton had been Sultana's college instructor in classes teaching the constitutional law applicable to police officers and private security officers. At the beginning of their exchange on April 17, 1985, Upton informed Sultana of his *Miranda* rights, including the right to appointed counsel. Sultana declared that he perfectly understood his rights. Sultana acknowledged that he was initiating the conversation and specifically told Upton that he had called Upton there to ask questions. We think there is no doubt here that Sultana "initiated" the exchange with Upton and waived his right to counsel following *Miranda* warnings.

The State is not required under either *Edwards* v. *Arizona, supra,* or *Michigan* v. *Jackson, supra,* to contact a defendant's attorney of record prior to questioning where the defendant has initiated "interrogation" and waived his right to counsel following *Miranda* warnings.[4] We do not think an obligation to contact a defendant's attorney is created because the defendant expresses a belief that his privately retained counsel is no longer working for him because he ran out of money. *Miranda* warnings inform a defendant that he is entitled to appointed counsel if he cannot afford retained counsel and a waiver of those rights waives the right to an attorney, either retained or appointed.

Of course, it would be an entirely different matter if governmental authorities improperly induced Sultana's belief that his privately-retained attorney of record was no longer working for him or that the public defender was overextended and, by implication, could not effectively represent his interests. Where police deliberately subvert a defendant's right to counsel, the fact that it was the defendant who initiated contact with authorities becomes irrelevant. (Cf. *Boulas* v. *Superior Court* (1986) 188 Cal.App.3d 422 [233 Cal.Rptr. 487] [police told accused that he would have to fire his retained counsel and hire counsel acceptable to the district attorney to secure a plea bargain].) However, that is not the case here.

## C

### *Voluntariness*

Sultana argues that his incriminating statements to Officer Upton were involuntary because Sultana believed his attorney was no longer working for him since he had run out of money and he felt compelled to turn to Upton. We disagree.

---

[4] See waiver discussion above.

■ "It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. [Citation.] . . . 'if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . .' [Citations.]" (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 611-612 [147 Cal.Rptr. 172, 580 P.2d 672]; see *Brady* v. *United States* (1970) 397 U.S. 742, 753 [25 L.Ed.2d 747, 759, 90 S.Ct. 1463]; *Malloy* v. *Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 658-659, 84 S.Ct. 1489]; *Bram* v. *United States* (1897) 168 U.S. 532, 542-543 [42 L.Ed. 568, 573, 18 S.Ct. 183].) The United States Supreme Court has further held that a confession cannot be "involuntary" within the meaning of the Due Process Clause of the Fourteenth Amendment unless there is coercive police activity.[5] (*Colorado* v. *Connelly, supra,* 479 U.S. 157, 167 [93 L.Ed.2d 473, 484].)

■ "The burden of proof which must be sustained by the prosecution on questions of voluntariness is proof beyond a reasonable doubt. [Citation.]"[6] (*People* v. *Hogan* (1982) 31 Cal.3d 815, 835 [183 Cal.Rptr. 817, 647 P.2d 93].) As the reviewing court, we ". . . must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must 'accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' [Citation.]" (*Ibid.*) The totality of circumstances must be considered in determining voluntariness. (*Id.* at p. 841.)

■ It is evident that Sultana summoned Officer Upton because he wanted the police to switch the focus of their criminal prosecution and

---

[5] It appears that under California constitutional standards coercive police activity is not a necessary predicate to finding that a confession was involuntary. (See e.g. *People* v. *MacPherson* (1970) 2 Cal.3d 109, 115 [84 Cal.Rptr. 129, 465 P.2d 17]; *People* v. *Berve* (1958) 51 Cal.2d 286, 293 [332 P.2d 97].) The effect of the "Truth-in-Evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) on this issue has not been directly determined by the California Supreme Court.

[6] We are aware that the issue whether the "Truth-in-Evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)) made the lesser federal preponderance of the evidence standard (*Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627, 92 S.Ct. 619]) applicable in California courts is currently pending before the California Supreme Court.

investigation to Ronzano. At the outset, Sultana told the officer that he had nothing to confess and persisted in his protestations of innocence. Officer Upton indicated that the investigation was continuing and he was willing to pursue any leads. However, Upton made no suggestion during the interview that Sultana would receive more lenient treatment or special benefits if he made any admissions or confessed. There was no evidence of police coercion. Furthermore, there was no evidence that Sultana acted against his will. To the contrary, the evidence suggests that he merely misjudged his self-interest.

II-IV*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Agliano, P. J., and Brauer, J., concurred.

A petition for a rehearing was denied August 31, 1988, and appellant's petition for review by the Supreme Court was denied November 9, 1988.

---

* See footnote, *ante,* page 511.