248 N.J. Super. 311 (1991)
590 A.2d 1220
STATE OF NEW JERSEY, PLAINTIFF,
v.
ISMAEL CARDONA, DEFENDANT.
Superior Court of New Jersey, Law Division (Criminal), Hudson County.
Decided March 8, 1991.
*312 Thomas Foti for plaintiff (Paul M. DePascale, Hudson County Prosecutor, attorney).
Carl Broege for defendant (Patricia M. Kay, Hudson County Public Defender, attorney).
COSTELLO, J.S.C.
The court is faced with a case of first impression in the State of New Jersey: is a defendant's statement that he was financially unable to pay for an attorney an ambiguous request for counsel?
In the early morning hours of October 19, 1989, the body of Milagros Cardona was discovered in a car in Hoboken. Police believed that her husband, defendant Ismael Cardona, was present at her death, then left the scene and went to Perth Amboy. At approximately 9:35 a.m., Cardona was arrested in Perth Amboy by the local police and was taken to the Perth Amboy Police Department Headquarters. Captain Cruz of that department was the ranking officer present. He took it upon himself to handle the questioning of Cardona because he had *313 experience in prior homicide investigations, because he spoke Spanish (Cardona did not speak English), and because he knew defendant's family and was acquainted with defendant.
In order to make Cardona comfortable and at ease and to facilitate obtaining a statement, Cruz had Cardona's handcuffs removed. Then Detective Conrad Marrero read Cardona his full Miranda rights. Immediately afterward Cruz asked defendant a series of questions, repeating each right individually and asking if defendant understood each of the rights. Defendant replied that he did. He signed a Miranda card indicating the same. Captain Cruz then proceeded to question defendant concerning his personal and marital background. (Although Cruz believed all of the above was being recorded on a tape machine, apparently the machine malfunctioned and the recording did not start until after the preliminaries were completed and defendant was being questioned about his wife's death). Throughout, defendant appeared sad and cried.
At the end of defendant's statement the following exchange took place:
Cruz: Listen to me, I read the constitutional rights to you, is that right? Also, Conrad Marrero, Detective Marrero, one of the guys who arrested you, he read the constitutional rights to you? How many times did he read them to you?
Cardona: Two times.
Cruz: Two times, okay. Do you have any knowledge of  is that right?
Cardona: Yes, but I don't know what that is.
Cruz: You don't know what your rights are?
Cardona: I know.
Cruz: Okay.
Cardona: To get an attorney and all that, for what, so he steals the money off me like he did the other time.
Cruz: Do you have a lawyer who ripped you off, who is that lawyer?
Cardona: A lawyer who wants to pay him $200.00.
....
Cruz: Do you want to call him [the lawyer] up?
Cardona: No, for what?
Cruz: You don't want to call your lawyer?
Cardona: No, with what money, I have no money. He wants....
*314 There were no further questions regarding the death of Milagros Cardona posed to defendant at that time.
In the meantime, four members of the Hudson County Prosecutor's Office, including Sergeant Franklin Romero, arrived at Perth Amboy Police Department Headquarters. Romero was told by his supervisor that Cardona had been arrested in possession of a gun, that he was a suspect in the death of his wife, and that Romero was needed to question him since Romero spoke Spanish and Cardona spoke no English. He was not told that the suspect had just given a statement to the Perth Amboy Police Department so he was unaware of the above colloquy.
At this point, Cardona was in "pretty bad shape emotionally," according to Romero. Romero tried to calm him down, and offered him coffee, water and cigarettes. He considered not trying to question him because defendant was too upset and considered the possibility that defendant himself might decide not to speak to him because he was too upset. At one point, however, Cardona calmed down and Romero gave him his Miranda warnings in Spanish. Cardona signed a Miranda card. Romero asked Cardona if he understood each right, and Cardona stated that he did understand. Cardona told Romero he wanted to talk and Romero proceeded to take a taped statement.
At the outset of the taped statement, Romero again advised defendant of his rights and defendant again indicated he understood those rights and stated he wanted to answer questions. He was then questioned concerning the circumstances of his wife's death. All of this was tape recorded.
It is a fundamental principle that a suspect subjected to custodial interrogation must be advised of his rights before he makes a statement, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If a statement is obtained, the government has a heavy burden of proving the suspect waived his rights knowingly, intelligently, and voluntarily. See id., 384 *315 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707; State v. McCloskey, 90 N.J. 18, 446 A.2d 1201 (1982). The validity of a suspect's waiver is judged by the totality of the circumstances and the mere language alone, chosen by a suspect, is not dispositive as to whether a valid waiver was made. See Boulden v. Holman, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); State v. Bey, 112 N.J. 45, 548 A.2d 846 (1988).
Equally fundamental is the principle that once a suspect invokes his right to counsel, all police questioning must stop. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The police may speak to the suspect only if he initiates further communication. See id., 451 U.S. at 484-485, 101 S.Ct. at 1884-1885, 68 L.Ed.2d at 386; Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); State v. Kennedy, 97 N.J. 278, 478 A.2d 723 (1984); State v. Fuller, 118 N.J. 75, 570 A.2d 429 (1990); State v. Carroll, 242 N.J. Super. 549, 577 A.2d 862 (App.Div. 1990). A waiver of rights obtained in violation of either the principles enunciated in Miranda or Edwards will result in a suppression.
Numerous courts outside of this jurisdiction have given inconsistent treatment to a suspect's statement that he cannot afford a lawyer. Some courts have held that such statements do not affect the validity of a waiver. See People v. Sultana, 204 Cal. App.3d 511, 251 Cal. Rptr. 115 (Cal.Ct.App. (1988)) cert. den. 489 U.S. 1057, 109 S.Ct. 1323, 103 L.Ed.2d 591 (1989) ("I've got no more attorney and no more money and then they get some law[yer] down the street here. Someone with 75 cases going and trying to take care of me now," id. 251 Cal. Rptr. at 116); People v. Mandrachio, 79 A.D.2d 278, 436 N.Y.S.2d 642 (1981), aff'd 55 N.Y.2d 906, 449 N.Y.S.2d 24, 433 N.E.2d 1272 (Ct.App. 1982), cert. den. 457 U.S. 1122, 102 S.Ct. 2939, 73 L.Ed.2d 1336 (1982) (defendant said he could not afford a lawyer, 79 A.D.2d at 282, 436 N.Y.S.2d at 645); Higgenbotham v. State, 769 S.W.2d 265 (Tex. App. 1989) (defendant said he could not afford an attorney, police then reiterated right to *316 court-appointed counsel, adding he had a right to one immediately); U.S. v. Gonzalez, 833 F.2d 1464 (11 Cir.1987) (defendant said legal counsel was too expensive, agents gave Miranda rights and she proceeded to give statement); Martinez v. State, 544 So.2d 310 (Fla.Ct.App. 1984) ("But what if I don't have any money?" id. at 311).
Still other courts faced with similar statements have invalidated waivers. See U.S. v. Yan, 704 F. Supp. 1203 (S.D.N.Y. 1988) (defendant told agents he could not afford a lawyer, but agents proceeded to secure search to consent); Fields v. State, 402 So.2d 46 (Fla.Ct.App. 1981) (mentally retarded juvenile said he could not afford an attorney, investigators did not clarify issue for him); Commissioner v. Waggoner, 373 Pa.Super. 23, 540 A.2d 280 (1988) (defendant stated "I can't afford a lawyer," id. 540 A.2d at 288, and police did not respond but continued to give remainder of warnings and to question); United States v. Gotay, 844 F.2d 971 (2 Cir.1988) (defendant stated she could not afford an attorney, she was advised that a court would take care of that, and the questioning proceeded); People v. Lubanski, 148 A.D.2d 947, 943, 539 N.Y.S.2d 185 (1989) (defendant told police that he could not afford an attorney's retainer fee, but the police continued questioning).
New Jersey courts scrupulously protect defendant's Fifth Amendment rights and invalidate waivers when a defendant makes an ambiguous request for counsel. State v. Wright, 97 N.J. 113, 477 A.2d 1265 (1984); State v. Elmore, 205 N.J. Super. 373, 500 A.2d 1089 (App.Div. 1985); State v. Dickens, 192 N.J. Super. 290, 469 A.2d 965 (App.Div. 1983); State v. Fussell, 174 N.J. Super. 14, 415 A.2d 351 (App.Div. 1980). The courts must similarly protect a defendant who claims he cannot afford counsel, when that claim indicates that he has not fully understood his rights, specifically the right to a court-appointed attorney.
Here, however, the court is satisfied that under the totality of these circumstances Cardona's comments are not an *317 ambiguous request for counsel and, therefore, his statements should not be suppressed. As stated in People v. Mandrachio, supra:
A verbal response or statement by a defendant in the course of investigation or interrogation should be evaluated not in isolation, but in relation to the surrounding mosaic of circumstances and dialogue. This common sense approach relieves untoward reliance on isolated instances or utterances which are, by themselves, unclear or ambiguous, but which obtain a marked degree of clarity and certainty when viewed in context with surrounding events. Further, this common sense approach honors the dispassionate appraisal of facts and the search for truth demanded by justice. .. . [79 A.D.2d at 282, n. 1, 436 N.Y.S.2d at 645, n. 1.]
Cardona had been given his Miranda warnings a total of five times. Each time the warnings were given in his native language, and each time he responded that he understood them. He was clearly in a very emotional state when the Perth Amboy statement was given. On the other hand, he was made comfortable, was allowed time to calm himself and, by his own admission, was well treated.
Cardona's statement had one prevailing theme: that his mother-in-law had set out to ruin him financially as part of her campaign to sabotage his marriage. He gave numerous examples, including complaints she had brought against him in various courts or had induced her daughter to file, all causing him to retain lawyers, and even an instance where, in his mind, she had financially ruined him by not providing car insurance for an expensive car he drove. In this context, during a stream of complaints against his wife's family, he blurted out the above quoted "With what money?" comment. This cry of alleged poverty was a continuation of the litany of injustices he claimed to have suffered at the hands of his in-laws. It was not an ambiguous request for counsel, and as such, did not have to be clarified or explored by the police before the interrogation could proceed. As stated by the United States Supreme Court in Connecticut v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987): "Nothing in our decisions, however, or in the rationale of Miranda, requires authorities to ignore the *318 tenor or sense of a defendant's response to these warnings." Id., 479 U.S. at 528, 107 S.Ct. at 831, 93 L.Ed.2d at 927.
Accordingly, the motion to suppress the statements is denied.