632 A.2d 845

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ISMAEL CARDONA, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted September 28, 1993—Decided November 4, 1993.

40

Before Judges SKILLMAN, KESTIN and WEFING.

*Zulima V. Farber,* Public Defender, attorney for appellant (*Linda Mehling,* Assistant Deputy Public Defender, of counsel and on the brief).

*Fred DeVesa,* Acting Attorney General, attorney for respondent (*Arthur J. Safir,* Deputy Attorney General, of counsel and on the letter brief).

The opinion of the Court was delivered by

WEFING, J.S.C. (temporarily assigned).

Defendant Ismael Cardona was convicted by a jury of aggravated manslaughter (*N.J.S.A.* 2C:11–4); possession of a handgun without the requisite permit (*N.J.S.A.* 2C:39–5b); and possession of a handgun with a purpose to use it unlawfully against the person of another (*N.J.S.A.* 2C:39–4a). He appeals those convictions and raises three arguments, none of which we find convincing.

### A.

The victim in this case was defendant's estranged wife, Milagros Cardona. Her body was found on the night of October 18, 1991 in a parked car in Hoboken with a gunshot wound to her left temple. The car was registered in the name of defendant who was arrested the following day. He was found hiding in the basement of his brother-in-law's home in Perth Amboy. At the time of his arrest, he had the fatal gun in his possession.

Defendant was taken to the Perth Amboy police station where he was interrogated by Captain Cruz of the Perth Amboy police force. Prior to any interrogation, Detective Marrero of the Perth

Amboy police twice told Mr. Cardona of his *Miranda* [1] rights; Captain Cruz repeated the *Miranda* warnings immediately before questioning Cardona. In addition, Cardona signed a card provided to him by Captain Cruz which set forth the required *Miranda* warnings. Captain Cruz proceeded to question Mr. Cardona who indicated that he had met with his estranged wife the previous night to discuss their relationship. During the course of their highly emotional conversation, Mr. Cardona produced a gun; he stated that he told his wife to kill him. He said that she didn't want to kill him and that she instead shot herself "because she told me she had too many problems." The questioning continued for a period of time, and then Captain Cruz returned to the subject of Cardona's *Miranda* rights with the following results:

Q: Did anybody here first of all let me ask you if anybody had promised you anything for saying that, correct?

A: No.

Q: Has anybody here punched you?

A: No, no, no, I know it, if you want to kill me, kill me.

Q: No, no. I want you to understand this, nobody had promised you anything is that right? Do you know all your constitutional rights? Is that right, I read them to you is that right?

A: I just want you to kill me.

Q: Listen to me, I read the constitutional rights to you, is that right? Also, Conrad Marrero, Detective Marrero one of the guys who arrested you, he read the constitutional rights to you, is that right? Did he read them to you how many times did he read them to you?

A: Two times.

Q: Two times. Okay, you do have knowledge of that is, that right.

A: Yes, but I don't know what that is.

Q: You don't know what your rights are?

A: I know.

Q: Okay.

A: To get an attorney and all that for what? So he steals the money off me like he did the other time?

Q: Did you have a lawyer who ripped you off? Who is that lawyer?

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

A: A lawyer wants me to pay him $200.00.

Q: Who is your lawyer?

A: The one from previous cases.

Q: What is his name?

A: No, I have a lawsuit there with (unintelligible).

Q: But who was the lawyer representing you?

A: What do you mean, from the other cases?

Q: On these cases.

A: What cases?

Q: Well the cases you said he stole the money off you?

A: Thief.

Q: Who, is he from here Perth Amboy? What is his name?

A: I don't know I don't....

Q: Do you want to call him up?

A: No, for what?

Q: You don't want to call your lawyer?

A: No, with what money, I have no money, he wants....

Cruz's interrogation of defendant came to a close thereafter, with no further questions directed at the substance of what occurred on the night in question.

While Cruz was questioning Cardona, members of the Hudson County Prosecutor's office arrived and Mr. Cardona was later questioned by Sergeant Franklin Romero. Romero was unaware of the exchange between Cruz and Cardona and he re-administered the *Miranda* warnings to Mr. Cardona. He also had Cardona sign a second *Miranda* card. Again, Cardona spoke freely. In this second statement, however, Mr. Cardona said that his wife Milagros had asked him to kill her and that he had refused to do so. According to Cardona, her response was to grab at the gun he was holding which then accidentally discharged, killing her.

Prior to any trial proceedings, the trial court held a hearing to determine the admissibility of either or both of the statements given by Mr. Cardona. Defendant sought to suppress those

statements on the ground that the colloquy set forth above represented an ambiguous request for counsel.

The trial court disagreed, concluding that the statement seen in context simply represented one more of Cardona's many complaints against Milagros's family, which had strongly disapproved of the couple's marriage. Within his statement to Captain Cruz, Cardona set forth at length his view that the actions of his wife's family had cost him significant amounts of money, and that he had been treated unfairly by them. The reasons of the trial judge in this regard are set forth in her written opinion reported at *State v. Cardona*, 248 *N.J.Super.* 311, 590 *A.*2d 1220 (Law Div.1991). Defendant argues on appeal that the trial judge erred in reaching that conclusion.

A defendant's waiver of his or her *Miranda* rights must be both knowing and intelligent and voluntary. *State v. Gerald*, 113 *N.J.* 40, 117, 549 *A.*2d 792 (1988). The State bears the burden of establishing beyond a reasonable doubt that a defendant's waiver of the privilege against self-incrimination and the right to counsel is knowing and intelligent and voluntary. *Id.* at 117–118, 549 *A.*2d 792. In determining whether a defendant has voluntarily waived those rights, courts look to the totality of the circumstances, including such factors as: "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved...." *State v. Miller*, 76 *N.J.* 392, 402, 388 *A.*2d 218 (1978). Here there was no physical punishment or mental exhaustion, although Cardona was clearly in emotional distress. The questioning was not prolonged, nor was it designed to trick him. Further, the officers recognized Cardona's difficulties with English; the *Miranda* warnings were consistently given to him in Spanish, both orally and in writing. He was questioned, moreover, only in Spanish.

The right to counsel is so fundamental that statements by a defendant which could be construed as a request for counsel must

be interpreted liberally in favor of the defendant. *State v. Wright,* 97 *N.J.* 113, 477 *A.*2d 1265 (1984).

"When a suspect makes a statement that arguably amounts to an assertion of *Miranda* rights, and the interrogating agent recognizes that the statement is susceptible to that construction, police questioning concerning the crime should immediately cease and the officer should then inquire of the suspect about the correct interpretation of the statement."

[*State v. Dixon,* 125 *N.J.* 223, 240–241, 593 *A.*2d 266 (1991).]

New Jersey has considered the following statements to constitute ambiguous requests for counsel which would bar any further interrogation: "I won't sign any more deeds without a lawyer present" (*State v. Wright, supra* ); "We have to put in the record that this statement had to stand the approval of the attorney before we can submit it as evidence" (*State v. Dickens,* 192 *N.J.Super.* 290, 469 *A.*2d 965 (App.Div.1983) *certif. denied,* 97 *N.J.* 697, 483 *A.*2d 207 (1984)); "I would like to wait for legal counsel after taking (sic), I would like him to read the statement before I answer" (*State v. Fussell,* 174 *N.J.Super.* 14, 415 *A.*2d 351 (App. Div.1980)). In *State v. Elmore,* 205 *N.J.Super.* 373, 500 *A.*2d 1089 (App.Div.1985), this court ruled that there should have been no interrogation of the defendant after the police overheard her tell her mother over the telephone that she was being denied an attorney.

Here, it would clearly have been preferable for the initial interrogating officer to have immediately clarified on the record that whether Mr. Cardona had suffered financial reverses due to the actions of his in-laws, or was involved in any disputes with the attorneys who were representing him in those controversies, he was nonetheless entitled to have counsel appointed free-of-charge in this matter. However, we are satisfied that the trial court correctly analyzed the context in which Mr. Cardona made this statement to Captain Cruz and that it did indeed represent merely one more complaint against his wife's family, rather than a request to consult with an attorney. This colloquy occurred, moreover, well after Cardona had been advised of his *Miranda* rights and after he gave his first voluntary rendition of what occurred. This

defendant received his *Miranda* warnings five separate times and each time indicated his full understanding of those rights. Armed with that understanding, he spoke freely and by his own choice about the incident to his questioners and we see no basis to suppress either of the conflicting statements he provided.

### B.

Prior to the matter being presented to the jury, defense counsel requested that the trial judge include within her charge to the jury not only the offense of aggravated manslaughter, but also the lesser included offense of provocation manslaughter under *N.J.S.A.* 2C:11–4b(2). The trial court refused to do so and defendant urges on appeal that this was error.

"It is clear that where there is evidence which if believed by a jury would reduce a crime to a lesser included offense than that charged in the indictment, an instruction that the jury may find the defendant guilty of the lesser included offense should be given." *State v. Hollander*, 201 *N.J.Super.* 453, 473, 493 *A*.2d 563 (App.Div.), *certif. denied*, 101 *N.J.* 335, 501 *A*.2d 983 (1985). If there is a rational basis in the evidence to support a conviction of that lesser included offense, such a charge should be given. *N.J.S.A.* 2C:1–8(e); *State v. Jordan*, 240 *N.J.Super.* 115, 572 *A*.2d 676 (App.Div.) *certif. denied*, 122 *N.J.* 328, 585 *A*.2d 345 (1990). A trial court, however, may not submit to a jury the possibility of convicting a defendant for a lesser included offense if the trial record does not contain factual support for that offense. *State v. Crisantos*, 102 *N.J.* 265, 276, 508 *A*.2d 167 (1986).

Our Supreme Court has recently restated the four elements of passion/provocation manslaughter: the provocation itself "must be adequate; the defendant must not have had time to cool off between the provocation and the slaying; the provocation must have actually impassioned the defendant; and the defendant must not have actually cooled off before the slaying." *State v. Mauricio*, 117 *N.J.* 402, 411, 568 *A*.2d 879 (1990). It is not sufficient for

a defendant to establish a combination of some of these elements; all four must be proven. In deciding whether a sufficient factual predicate has been established to permit submission to the jury of passion/provocation manslaughter as a lesser included offense, the adequacy of the provocation and whether there was an insufficient time to cool off are assessed by an objective standard. The remaining factors (i.e., being actually impassioned and not having cooled off) are assessed subjectively, that is, with regard to the particular defendant.

Nothing within the record presented would satisfy any of the elements required under *State v. Mauricio, supra.* The only provocation pointed to by this defendant was the victim's alleged inconsistent behavior—seeing him freely on some occasions while enforcing restraining orders which had been obtained against him on others. That can hardly constitute provocation "sufficient to arouse the passions of an ordinary person beyond the power of his control." *State v. Mauricio, supra,* 117 *N.J.* at 412, 568 *A.*2d 879. As this court noted in *State v. Hollander, supra,* "declining defendant's advances did not give him provocation to kill her." 201 *N.J.Super.* at 475, 493 *A.*2d 563.

## C.

Finally, defendant contends that his sentence was manifestly excessive. The trial court sentenced him to thirty years on the aggravated manslaughter conviction and imposed a fifteen year parole disqualification. For the conviction of possession of a handgun without a permit, he was sentenced to a concurrent term of five years with two and one-half years of parole disqualification and for the conviction of possession of a handgun with the purpose to use it unlawfully against the person of another, he was sentenced to a concurrent ten year term with a five year parole disqualification. The trial judge appropriately weighed the aggravating and mitigating factors and set forth the reasons in support

of the sentence she imposed. We find no abuse of discretion in this regard.

Affirmed.