**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4786-15T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHARLES F. SAWYER,

     Defendant-Appellant.

_____

          Submitted January 14, 2019 – Decided January 30, 2019

          Before Judges Fasciale, Gooden Brown and Rose.

          On appeal from Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 13-07-0746.

          Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

          Gurbir S. Grewal, Attorney General, attorney for respondent (Lila B. Leonard, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions for first-degree murder, N.J.S.A. 2C:11-3(a)(1)(Count One); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(Count Two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(Count Three); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3)(Count Four); first-degree kidnapping, N.J.S.A. 2C:13-1(b)(Count Five); second-degree burglary, N.J.S.A. 2C:18-2 (Count Six); third-degree theft by unlawful taking, N.J.S.A. 2C:20-3 (Count Seven); third-degree terroristic threats, N.J.S.A. 2C:12-3(b)(Count Eight); and fourth-degree aggravated assault with a firearm, N.J.S.A. 2C:12-1(b)(4)(Count Nine). We affirm.

Defendant placed a gun to the head of his ex-wife (the victim), pulled the trigger, and shot her. He did that after entering her home and tying her arms around her back with duct tape. She died that night. After shooting her, defendant drove to his son's (the son) home and parked in the driveway. Ten minutes later, the son approached defendant, who had remained inside his vehicle, to find out why he was there. Defendant gave the son a sock containing $2000, keys to another vehicle, and while looking down and staring at his steering wheel, defendant repeatedly told the son "I f***** up." Defendant then drove away.

The son called defendant's cell phone, but defendant did not answer. The son called the victim, but there was no answer. The son then called his brother (the brother) and reported what had happened and said he was driving to the victim's house. On the way to the victim's home, the son called 9-1-1. Before arriving at the house, the police requested that the son call defendant once more on his cell phone to help the police locate defendant's whereabouts. The son complied and defendant answered the call but then quickly hung up. The brother also called defendant several times that night.

The multiple calls to defendant, coupled with defendant's use of his own phone, disclosed that he was hiding in a trailer park. Detective Kevin Husband and Trooper Matthew Cocking converged at that location. The officers approached the side of a trailer, and called out "anybody inside, come out with your hands up." Defendant appeared from behind the trailer and followed the instructions by the officers, who handcuffed and arrested him. They located the gun, which was nearby.

Meanwhile, first responders investigated the crime scene. They found the victim's body, with duct tape around her arms in a pool of blood. They located a piece of copper jacketing from a bullet on the floor near her body, a bullet

behind a nearby air vent cover, and the roll of duct tape on the floor near the pool of blood.

At defendant's house, the police found his vehicle – containing duct tape in the door pocket, a laptop computer on the backseat floor, and keys in the trunk – parked in the driveway. Inside the home, the police located pieces of duct tape in the living room on the floor, coffee table, and hallway. They also found airline correspondence on the coffee table, paperwork related to the victim's divorce from defendant eight years earlier, and his passport tucked away in a suitcase.

Defendant's friend (the friend) testified that shortly before the murder, he had asked defendant to housesit while he and his family went on vacation. Defendant agreed to do so and was the only person at the friend's home where defendant had access to numerous firearms, including a .45 military handgun, a semiautomatic gun, a .357 revolver, and a .9-millimeter semiautomatic handgun. The friend identified the .357 revolver – manufactured by Charter Arms and introduced into evidence – as his gun. The police found this gun at the trailer park.

Defendant testified at the trial. He explained that he brought the gun with him, at the victim's request, because she was interested in purchasing it.

Defendant said the victim loaded the gun, and that it accidentally went off as he tried to take it from her. He stated the shooting was "no head shot." Defendant called 9-1-1 after the shooting, and the jury heard a recording of the 9-1-1 call in which he stated that he accidentally shot his "wife," he was trying to scare her, and he pulled the hammer back on the gun. At trial, defendant testified that he did not remember making that call.

A firearm and tool-mark expert employed by the police examined the .357 revolver that the police found at the trailer park. Based on his expert opinion, he said that the gun was not defective and it would have been impossible for the gun to accidentally discharge. He testified that out of more than 10,000 guns that he had tested, none of the guns made by Charter Arms would discharge accidentally.

The State presented testimony from detectives who determined that during the shooting, the victim was laying down and facing upwards due to the amount of her blood on the floor and lack of blood on the walls. The medical examiner testified that the victim died by a perforating contact gunshot to the left side of her head. Based upon the contact wound, tears in the skin, soot from the gun barrel, and gas discharge from the gun, he concluded that the perpetrator of the crime pressed the gun tightly against the victim's skull.

On appeal, defendant argues:

POINT I
THE TRIAL COURT ERRED IN PERMITTING THE PROSECUTOR TO ADMIT INTO EVIDENCE AT TRIAL STATEMENTS MADE BY DEFENDANT TO A WITNESS REFERENCING A PRIOR COMPLAINT ABOUT DEFENDANT MADE TO POLICE BY THE VICTIM.

A. The Evidence In Question.

B. The Evidence Was Not Intrinsic To The Offense of Burglary.

C. The Evidence Was Not Admissible To Establish Its Effect on The Listener.

D. The Evidence Was Not A Statement Against Interest.

POINT II
THE TRIAL COURT ERRED IN FAILING TO CHARGE THE JURY ON THE LESSER-INCLUDED OFFENSE OF PASSION/PROVOCATION MANSLAUGHTER, AND ON THE JUSTIFICATION OF SELF-DEFENSE, WHEN EVIDENCE IN THE RECORD CLEARLY INDICATED THE APPLICABILITY OF BOTH CHARGES. (Not Raised Below).

A. The Trial Court Erred When It Failed To Instruct The Jury On The Lesser-Included Offense of Passion/Provocation Manslaughter.

B. The Trial Court Erred When It Failed To Instruct The Jury On Self-Defense.

A-4786-15T2

POINT III
THE TRIAL COURT ERRED IN PERMITTING THE
STATE TO SUPPLEMENT THE JURY
QUESTIONNAIRE WITH QUESTIONS ASKING
POTENTIAL JUROR[]S ABOUT THEIR OPINIONS
ON DOMESTIC VIOLENCE AND DESCRIBING
THE CASE AS INVOLVING DOMESTIC
VIOLENCE WHEN NO SUCH EVIDENCE WAS
PRESENTED AT TRIAL. (Not Raised Below).

POINT IV
THE SENTENCE IMPOSED IS MANIFESTLY
EXCESSIVE AND MUST BE REDUCED.

    A.  The Sentence Imposed.

    B. The Sentencing Court Erroneously
Applied Aggravating Factors (1) and (15).

    C. The Sentencing Court Erred When It
Imposed A Consecutive Sentence on Count
Seven.

    D. The Sentencing Court Erred When It
Imposed Fines On The Merged Offenses
And Imposed A Domestic Violence
Offender Surcharge.

I.

We begin by addressing defendant's contention that the judge made an erroneous evidentiary ruling. In evaluating defendant's contention, we acknowledge the strong degree of deference we generally accord criminal trial judges in their rulings on evidential admissibility. Such rulings generally

7

"should be upheld 'absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "An appellate court applying this standard 'should not substitute its own judgment for that of the trial court, unless the trial court's ruling is so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting Brown, 170 N.J. at 147). Applying this standard, we see no such "manifest denial of justice" or clear error here.

The State produced Sergeant William McCain as a witness, who testified about a conversation he had with defendant shortly before the murder. The assistant prosecutor prepared her direct-examination questions and reviewed them with McCain, and then with defense counsel before she questioned McCain. She also asked the judge for permission to lead McCain through his testimony to avoid the possibility that he would blurt out the details of the victim's complaint that defendant had recently harassed her. Defense counsel did not object.

McCain, who was an acquaintance of defendant for over thirty years and who was a close friend of his extended family, testified that he unexpectedly saw defendant at Target four days before the murder. McCain testified defendant "was very concerned . . . that [the victim] had contacted the police the

day before [he saw defendant at Target]."  He described defendant as "upset," and said that defendant told him he would not contact the victim at all.  McCain did not give details of the victim's call to the police.

In addition to showing defense counsel the direct-examination questions in advance, the assistant prosecutor prepared a limited jury instruction for the judge to read after she completed her questioning of McCain about the conversation at Target.  Without objection, the judge used the proposed Rule 404(b)-type charge and told the jury:

> Let me just [say], ladies and gentlemen, from time to time, during the course of the trial, there will be some instructions that I give you during the testimony of any one particular witness.  Those instructions are often referred to as a limiting instruction.  And the reason for that phraseology, limiting instruction, is to instruct you as to the limited purpose of certain testimony and your ability to use it in a limited way.  Th[e] . . . testimony from Sergeant McCain falls within that category.
>
> So in that regard, you have heard that the defendant made statements at a time prior to the alleged incident. <u>The fact that within that testimony you heard that [the victim] had gone to the police to make some form of a complaint is not for your consideration</u>.  You are to consider only how the conversation had an impact on the listener, meaning the conversation between then Corporal McCain and [defendant], had an impact upon the listener, that being [defendant].  <u>You are not to speculate as to why, what or even the veracity of [the victim]'s visit to the police or the statements she</u>

> made during that visit to the police, only, again, as to the conversation between then Corporal McCain and [defendant] and the impact of that conversation upon [defendant].
>
> [(emphasis added).]

The judge correctly concluded that the testimony from McCain was intrinsic to the offense of second-degree burglary. Evidence – like here – is intrinsic if it directly proves the crime charged. State v. Rose, 206 N.J. 141, 180 (2011). But "[w]henever the admissibility of uncharged bad evidence is implicated, a Rule 404(b) analysis must be undertaken."[1] Id. at 179. Here, we undertake such an analysis especially because the limited charge given by the judge instructed the jury not to consider or speculate why the victim went to the police. We perform this analysis de novo because the judge did not do so. See State v. Garrison, 228 N.J. 182, 194 (2017) (indicating that courts "cautiously examine" any evidence that is "in the nature of prior bad acts").

Under that rule, evidence of other crimes, wrongs, or acts are generally not admissible unless admitted for another permissible purpose. See Rose, 206 N.J. at 180-82. Rule 404(b) states:

---

[1] We are aware that "if evidence is found to be intrinsic to the crime at issue, it does not constitute other-acts evidence and is subject only to the limits of Rule 403." State v. Santamaria, ___ N.J. ___ (2019) (slip op. at 23). Nevertheless, we undertake a Rule 404(b) analysis as the Court had done in Garrison.

> Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

See also State v. Cofield, 127 N.J. 328, 338 (1992) (stating four-factor test set forth to evaluate admissibility of evidence pursuant to Rule 404(b)).

McCain's testimony satisfied the first prong of the Cofield analysis, which requires that the evidence "must be admissible as relevant to a material issue." Ibid.; see Rose, 206 N.J. at 160 (stating that evidence in question must have "tendency in reason to prove or disprove any fact of consequence" by making desired inference more probable than if evidence were not admitted). Rule 401 defines relevant evidence as evidence that tends to prove or disprove a fact of consequence. State v. Darby, 174 N.J. 509, 519 (2002). As to the second-degree burglary charge, N.J.S.A. 2C:18-2 states in pertinent part that

> [a] person is guilty of burglary if, with purpose to commit an offense therein or thereon he:
>
> (1) Enters a . . . structure, . . . unless the structure was at the time open to the public or the actor is licensed or privileged to enter;

> (2) Surreptitiously remains in [the] . . . structure, . . . knowing that he is not licensed or privileged to do so;
>
>  . . . .
>
> Burglary is a crime of the second degree if in the course of committing the offense, the actor:
>
> (1) Purposely, knowingly or recklessly inflicts, attempts to inflict or threatens to inflict bodily injury on anyone; or
>
> (2) Is armed with or displays what appear to be explosives or a deadly weapon.

From McCain's testimony, the jury could infer that defendant knew he was unwelcome in the victim's home.

As to prong two, the other crime evidence "must be similar in kind and reasonably close in time to the offense charged." Cofield, 127 N.J. at 338. Here, the conversation between McCain and defendant took place four days before he murdered the victim, and one day after she complained to the police. Moreover, the conversation centered on defendant's relationship with the victim and his understanding that he was unwelcome around her. Thus, the State satisfied the second prong of Cofield.

As to prong three, "[t]he evidence of the other crime must be clear and convincing." Ibid.; see Rose, 206 N.J. at 160 (explaining that State must demonstrate that uncharged conduct "actually happened" by clear and

convincing evidence). McCain provided a level of detail about his conversation with defendant that is consistent with the other facts established at trial. For example, the record reflects that defendant sent the victim harassing text messages in the days preceding his conversation with McCain, and thus this evidence corroborated defendant's strained relationship with the victim. Moreover, the jury heard testimony that the victim sent defendant a text message the day before defendant's encounter with McCain, in which she told him not to come to her home anymore because she was afraid of him. This corroborative evidence demonstrated that it was highly probable that the conversation at Target occurred. See State v. Hernandez, 334 N.J. Super. 264, 271 (App. Div. 2000) (stating that "clear and convincing" evidence establishes for trier of fact firm belief as to truth about matter at issue). The State therefore satisfied prong three of Cofield.

As to prong four, "[t]he probative value of the evidence must not be outweighed by its apparent prejudice." Cofield, 127 N.J. at 338. The probative value of the evidence was high because it further heighted defendant's awareness that the victim did not want him near her. Moreover, at trial, defendant did not deny receiving text messages from the victim in which she told defendant to stay away from her home. Thus, McCain's testimony – which omitted the details of

13

the victim's domestic violence complaint – was substantially more probative than prejudicial.

The judge also concluded correctly that defendant's statement to McCain – that he would stay away from the victim – was admissible as a statement-against-interest under Rule 803(c)(25), which allows a hearsay statement to be admitted into evidence if it

> was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability, or to render invalid declarant's claim against another, that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true. Such a statement is admissible against an accused in a criminal action only if the accused was the declarant.

"The statement-against-interest exception is based on the theory that, by human nature, individuals will neither assert, concede, nor admit to facts that would affect them unfavorably." State v. White, 158 N.J. 230, 238 (1999).

Thus, for this hearsay exception to apply, "there must be some evidence establishing that the putative declarant actually made the statement in question." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 2 on N.J.R.E. 803(c)(25) (2018) (citing State v. Bowens, 219 N.J. Super. 290, 296 (App. Div. 1987)). The State produced ample evidence at trial demonstrating that defendant

14

indeed made the statement. Defendant's statement was against his social interest because he shared with McCain his decision not to contact the victim. His statement is inherently reliable because defendant would not have told McCain about his personal problems with the victim unless those statements were true. See White, 158 N.J. at 238 (explaining that in general people do not make unfavorable statements unless statements are true).

Additionally, the judge concluded that defendant was a "listener" and therefore admitted the conversation to show defendant's awareness that the victim did not want him to contact her. Generally, evidence admitted under this method is used to show a listener's state of mind or that the listener took certain action because of a statement. Biunno, Weissbard & Zegas, cmt. 4 on N.J.R.E. 801. Although the limited jury charge referred to defendant as a "listener," defendant was technically not the listener, but rather, he was the speaker – that is, the one who told McCain "now that [the victim] is involved with police[,] [he] was not going to contact her at all." Nevertheless, the State contended that defendant was the "listener," and that he had made the statement in response to McCain's comments that the victim had gone to the police. Defense counsel did not object to the limited instruction.

We review the limited jury instruction for plain error because defense counsel did not object. Cofield, 127 N.J. at 341. Plain error is an error "clearly capable of producing an unjust result." State v. Macon, 57 N.J. 325, 337 (1971); see also State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974) (stating that errors that are induced, encouraged by, or consented to by defense counsel are typically not the basis for reversal). We see no plain error here.

Referring to defendant as the "listener" – even if that were inaccurate – would not have led the jury to consider McCain's testimony for the impermissible purpose of wondering why the victim went to the police. And even if the evidence was not intrinsic to the second-degree burglary charge, and was instead classic Rule 404(b) evidence, as our analysis demonstrates, the judge essentially instructed the jury not to consider the Target conversation as propensity evidence. With the instruction as given, to consider defendant as a "listener," the jury still would have only acknowledged that defendant knew he was not supposed to go near the victim. Thus, the wording of the instruction was not capable of producing an unjust result, especially because of the overwhelming evidence of guilt.[2] Regardless, defendant's admission that he

---

[2] See State v. Pressley, 232 N.J. 587, 594 (2018) (stating that misstatement of law during State's summation was not capable of creating unjust result "in light

would leave her alone was intrinsic to the second-degree burglary charge and the judge properly admitted the statement as an exception to the hearsay rule (Rule 803(c)(25)). Therefore, the jury considered it for its truth when they evaluated the second-degree burglary charge.

## II.

We reject defendant's argument that the judge erred by not sua sponte charging the jury on a lesser-included offense of passion/provocation manslaughter and a justification of self-defense. Defendant concedes that his trial counsel did not request that the judge give these instructions. We therefore consider this contention for plain error.

Under N.J.S.A. 2C:11-4(b)(2), criminal homicide constitutes manslaughter when a homicide that would otherwise be considered murder

---

of the overwhelming evidence of defendant's guilt"); see also State v. Prall, 231 N.J. 567, 571-72 (2018) (holding that defendant's convictions would be affirmed despite absence of limiting instruction, use of bad act evidence during summations, and admission of hearsay because errors "were not capable of producing an unjust result because of the overwhelming weight and quality of the evidence" against defendant); State v. Weston, 222 N.J. 277, 294-300 (2015) (directing reviewing court to look at whether alleged error had clear capacity to cause unjust result and, also, strength of State's case); State v. Sowell, 213 N.J. 89, 107-08 (2013) (affirming conviction on strength of State's case despite improper admission of expert testimony); State v. Vick, 117 N.J. 288, 292 (1989) (stating that error in jury instructions is only excusable if harmless beyond reasonable doubt).

under N.J.S.A. 2C:11-3 is committed "in the heat of passion resulting from a reasonable provocation."  A trial court may not submit to the jury a lesser-included offense if the trial record does not contain factual support for it.  State v. Hollander, 201 N.J. Super. 453, 473 (App. Div. 1985); see also State v. Cardona, 268 N.J. Super. 38, 46 (App. Div. 1993) (setting forth four required elements of passion/provocation manslaughter: provocation must be adequate; defendant must not have had time to cool off; provocation must have actually impassioned defendant; and defendant must not have actually cooled off before slaying).

Here, the jury heard no evidence that defendant acted in the heat of passion or in response to adequate provocation.  See State v. Crisantos, 102 N.J. 265, 276 (1986) (stating that it is improper for the court to charge passion/provocation manslaughter when there is no rational basis in the record to support such a charge).  Rather, the evidence demonstrated that defendant appeared at the victim's home armed with a gun after he sent her harassing text messages within a few days of her telling him to stay away.  The evidence demonstrates that defendant attacked her.  Even defendant's testimony – that the gun accidentally discharged when the victim grabbed his arm – did not support a passion/provocation manslaughter charge.  Under N.J.S.A. 2C:1-8(d)(1), an

instruction on passion/provocation manslaughter was unwarranted. We see no error, let alone plain error.

Likewise, the judge did not err by failing to give a self-defense jury charge. Pursuant to N.J.S.A. 2C:3-4(a), the use of force is permissible for self-defense if "the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." The use of force is unjustified if he "with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter." N.J.S.A. 2C:3-4(b)(2)(a).

Here, there was no rational basis for charging the jury with the justification of self-defense. See State v. Daniels, 224 N.J. 168, 181 (2016) (holding that court should provide affirmative defense charge requested by defense if "there is a rational basis to do so based on the evidence"). The police found the victim's body with her hands duct-taped behind her back. Defendant pressed the gun firmly against the left side of the victim's head. Defendant's 9-1-1 call captured defendant's admission that he shot the victim intending to scare her with the gun. Thus, the evidence contradicted the justification of self-defense, and there was no rational basis for the court to provide this jury charge. See State v. Doss, 310 N.J. Super. 450, 456-58 (App. Div. 1998) (explaining

that the trial court did not commit plain error when it failed to sua sponte instruct the jury on self-defense because evidence at trial did not support it).

III.

Prior to voir dire, the State proposed that the judge add four additional questions to the jury questionnaire. The judge reviewed the four questions with counsel:

> [Number one]. [W]hat are your feelings regarding the problem of domestic violence in society today?
>
> Number [two]. [H]ave you or anyone close to you, ever been a victim of domestic violence? If your answer is yes, do you think that you could . . . fairly judge this case, given the allegations of domestic violence?
>
> [Number three]. Do[] you or anyone close to you[] work or volunteer for a domestic violence advocacy group? If so, would this affect your ability to be fair and impartial?
>
> Number [four]. [I]n this case, [defendant] is accused of acts of domestic violence . . . based upon . . . your feelings on the subject, do you think that you could fairly judge him on . . . the other charges?

In response, defense counsel stated "Your Honor, I think that those proposed questions to the jury are appropriate; and, I would not oppose those being asked by the [c]ourt, in addition to the standard jury questions." Subsequently, the

20

judge addressed the four domestic violence questions with each of the potential jurors.

The questions did not indicate that there was a history of domestic violence between the victim and defendant. A judge in a criminal matter acts as a gatekeeper for securing an impartial jury. State v. Tyler, 176 N.J. 171, 181 (2003). That is exactly what the judge did here. Importantly, our Supreme Court has explained:

> The courts in this State have recognized that under the State Constitution, Art. I, par. 10, the right of a defendant to be tried by an impartial jury is of exceptional significance. We have stressed repeatedly that the triers of fact must be "as nearly impartial 'as the lot of humanity will admit.'"
>
> [State v. Williams, 93 N.J. 39, 60 (1983) (citations omitted).]

Contrary to defendant's assertions on appeal, the judge asked the questions to ensure that defendant would receive a fair trial. The judge sufficiently tailored the questions so that they did not suggest or reference a prior history of domestic violence between defendant and the victim, and accurately prepared potential jurors for the evidence that they would hear. The four questions ensured, rather than deprived, defendant of a fair trial. We see no error or abuse of discretion during the voir dire.

A-4786-15T2

IV.

Finally, we address defendant's contentions as to his sentence. After the appropriate mergers, the judge imposed an aggregate prison sentence of sixty-one years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.[3] He contends that the judge improperly found aggravating factors one (the nature and circumstances of the act were especially cruel) and fifteen (the act involved domestic violence); erroneously imposed a consecutive sentence; and imposed the wrong fines. We conclude the judge correctly applied the governing law and see no abuse of discretion. But we direct the judge to amend the judgment of conviction to enter the correct fines.

An appellate court applies "a deferential standard of review to the sentencing court's determination, but not to the interpretation of a law." State v. Bolvito, 217 N.J. 221, 228 (2014). "Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). An appellate court may not "substitute

---

[3]  He merged Counts Two, Four, Six, Eight, and Nine into Count One and sentenced him to fifty-six years in prison subject to NERA; and he ran concurrent prison terms of ten years on Count Three, and twenty years on Count Five; consecutive to five years on Count Seven. The aggregate prison term was sixty-one years subject to NERA.

[its] judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014).

We must, however, ensure that the trial court followed the appropriate sentencing guidelines. We determine whether the trial court: 1) exercised discretion that "was based upon findings of fact grounded in competent, reasonably credible evidence"; 2) "applied the correct legal principles in exercising its discretion"; and 3) applied the facts to the law in a manner that demonstrates "such a clear error of [judgment] that it shocks the conscience." State v. McDuffie, 450 N.J. Super. 554, 576 (App. Div. 2017) (quoting State v. Megargel, 143 N.J. 484, 493 (1996)). "In exercising its authority to impose sentence, the trial court must identify and weigh all of the relevant aggravating factors that bear upon the appropriate sentence as well as those mitigating factors that are 'fully supported by the evidence.'" Blackmon, 202 N.J. at 296 (quoting State v. Dalziel, 182 N.J. 494, 505 (2005)).

The judge found aggravating factors one, three, nine and fifteen. He then considered and rejected the remaining aggravating factors under the statute. As for the mitigating factors, the judge considered all of them, but found only mitigating factors six and seven. He concluded that the aggravating factors substantially outweighed the mitigating factors by "overwhelming, clear and

convincing evidence."  Defendant focuses on aggravating factors one and fifteen.

The judge found aggravating factor one and gave it significant weight, concluding that defendant's actions were especially cruel.  The judge noted that defendant sent the victim numerous harassing text messages in the days preceding her death, which caused her to fear for her safety.  Defendant stalked her at work during the final days before the murder; he entered her home without permission; he bound her with duct tape, thereby rendering her helpless; he confronted her; and he shot her while holding the gun pressed to her head.

As to aggravating factor one, the Court has recognized that "double counting" is impermissible.  State v. Fuentes, 217 N.J. 57, 74-75 (2014). "Double counting" is prohibited because an element of the offense may not be cited as an aggravating factor to increase punishment.  Ibid.  Here, the judge did not engage in double counting.  Rather, he considered factors outside of the elements of the offenses when it discussed the circumstances surrounding the victim's death, such as her awareness that she was going to be killed.  Moreover, the judge discussed and considered the terror he believed that the victim experienced when defendant entered her home after he had sent her threatening text messages a few days earlier.  Her terror and her awareness of her impending

death were not elements of the crimes for which defendant was charged. Thus, the court did not engage in impermissible double counting.

The judge applied aggravating factor fifteen. The judge focused on the threatening nature of defendant's text messages to the victim. He explained that prior acts of domestic violence – on more than one occasion – increased the victim's fear of defendant. The judge gave aggravating factor fifteen less weight because there was no prior adjudication of acts of domestic violence. Nevertheless, the evidence showed that the victim would have been protected under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, and the State proved that defendant committed one or more of the predicate acts as set forth in N.J.S.A. 2C:25-19(a). Indeed, defendant admitted at the trial that he sent the victim several text messages in the days leading to her death.

"[M]ultiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a); see also State v. Randolph, 210 N.J. 330, 354 (2012) (finding that a sentencing court should be cautious when imposing "multiple consecutive maximum sentences unless circumstances justifying such an extraordinary overall sentence are fully explicated on the record"). Five factors that a court should consider in determining whether to impose a concurrent or consecutive sentence are:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous.

[State v. Molina, 168 N.J. 436, 441-42 (2001) (quoting State v. Yarbough, 100 N.J. 627, 644 (1985)).]

These factors "should be applied qualitatively, not quantitatively." State v. Carey, 168 N.J. 413, 427 (2001).

The judge considered the Yarbough factors. Defendant's theft of the friend's gun pertained to a different victim – that is, the friend. Although defendant used the gun to kill the victim, the theft constitutes a separate act defendant committed. Moreover, defendant's convictions on Counts Two and Three did not require that the gun be stolen, as opposed to Count Seven.

We agree with the State that the judge properly imposed a $100 fine because the victim was a victim of domestic violence, but the judge fined defendant on the convictions that he merged. The State consents to a limited

26

remand for the sole purpose of amending the JOC to correct the Victims of Crime Compensation and Safe Neighborhood Services Fund Assessments.

We conclude that defendant's remaining arguments – to the extent that we may not have addressed them – are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

We therefore affirm the convictions, but we direct the judge to amend the JOC to reflect the proper fines in accordance with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4786-15T2